# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2677

_____

| | | |
|---|---|---|
| Minnesota Association of Nurse Anesthetists, et al., | * * * | |
| Plaintiffs - Appellants, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Minnesota. |
| | * | |
| Unity Hospital, et al., | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: October 18, 1999

Filed: April 3, 2000

_____

Before WOLLMAN, Chief Judge, LAY and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

Both physician anesthesiologists and nurse anesthetists are licensed in Minnesota to administer anesthesia during surgeries. Though they typically work as a team during an individual surgery, anesthesiologists and nurse anesthetists compete for the contractual right to provide anesthesia services at hospitals and other surgical facilities. In this antitrust case, twelve nurse anesthetists and the Minnesota Association of Nurse

Anesthetists appeal the district court's[1] grant of summary judgment dismissing their claims attacking exclusive dealing arrangements between three Minnesota hospitals and two groups of anesthesiologists. Concluding that these contracts are not properly analyzed as boycotts, and that plaintiffs have totally failed to demonstrate either market power or "actual, sustained adverse effects on competition," FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 461 (1986), we affirm.

## I.

Nurse anesthetists work under the direction of a physician. Anesthesiologists are physicians who may administer anesthesia themselves or supervise one or more nurse anesthetists as they provide anesthesia services during surgeries. Historically in Minnesota, many hospitals employed nurse anesthetists and included the charges for their services in hospital bills, whereas anesthesiologists, like other physicians, billed patients directly. The rise of managed health care plans and the accompanying focus on health-care cost containment have put financial and competitive pressures on this dual-billing marketplace. To illustrate, we briefly summarize recent changes in Medicare reimbursement policies that played a significant role in triggering the contracts at issue in this lawsuit.

For many years, hospitals submitted non-itemized bills to Medicare that included all anesthesia services related to a surgery, including the services of nurse anesthetists employed by the hospital. Indeed, Medicare did not permit nurse anesthetists to bill directly.[2] If an anesthesiologist also attended a surgery, he or she would separately bill Medicare, and that bill did not necessarily indicate whether the anesthesiologist had

---

[1]The HONORABLE ANN D. MONTGOMERY, United States District Judge for the District of Minnesota.

[2]In 1989, Congress gave nurse anesthetists the authority to bill Medicare separately for their services. See 42 U.S.C. 1395*l*(*l*)(5).

administered anesthesia or simply supervised a nurse anesthetist. Therefore, accidental or intentional "double billing" was a real possibility. In response, the Secretary of Health and Human Services amended the Medicare regulations to allow anesthesiologists different rates of reimbursement depending upon whether they personally administered the anesthesia, "directed" up to four concurrent procedures, or "supervised" more than four procedures. See 42 U.S.C. § 1395xx; 42 C.F.R. § 415.110. These changes posed problems for hospitals that included nurse anesthetist services in their billings. For example:

-- The new regulations prohibited reimbursement of both an anesthesiologist and a nurse anesthetist when the anesthesiologist was attending only one procedure, even if the nurse anesthetist had assisted. The anesthesiologist was deemed to have personally performed the single procedure. Absent documentation establishing the medical necessity for two anesthesia providers, if the anesthesiologist submitted a separate bill, Medicare would not pay the hospital for the nurse anesthetist's services.[3]

-- The combined fees for a supervising anesthesiologist and a nurse anesthetist would frequently exceed the fee of an anesthesiologist working alone. In 1993, to address this problem, Congress capped anesthesia team payments at 120 percent of a solo anesthesiologist's fee (decreasing to 100 percent in 1998), the total fee to be split equally between the anesthesiologist and the nurse anesthetist. See 42 U.S.C. § 1395w-4(a)(4); § 1395*l*(*l*)(4)(B)(iii).

Some Minnesota hospitals (the record fails to reveal how many) responded to these and other market changes by deciding to "sole-source" their anesthesia services. These hospitals terminated their nurse anesthetist employees and entered into exclusive

---

[3]In 1998, the regulations were amended to allow for 50-50 reimbursement of the anesthesiologist and the nurse anesthetist in these situations. See 42 C.F.R. § 414.46(d)(iii).

contracts with groups of practicing anesthesiologists for the provision of all anesthesia services. The anesthesiologists agreed to provide all the hospital's requirements for nurse anesthetist services, either by directly employing nurse anesthetists (usually those previously employed by the hospital), or by subcontracting with organizations formed to provide nurse anesthetist services at rates separately negotiated with third-party payors of health care benefits such as insurance companies.

Defendants Unity Hospital and Mercy Hospital are Twin Cities suburban hospitals owned by defendant Allina Health System Corporation. Unity and Mercy implemented these changes in March 1994, after a year of planning. Unity and Mercy terminated their nurse anesthetist employees and entered into an exclusive contract with defendant Midwest Anesthesia, P.A. Many of the terminated nurse anesthetists then formed Nurse Anesthesia Services, P.A., which contracted with Midwest to provide nurse anesthetist services at Unity and Mercy. Similarly, in November 1994, defendant St. Cloud Hospital terminated its nurse anesthetists and entered into an exclusive contract with defendant Anesthesia Associates of St. Cloud. The terminated nurse anesthetists were offered employment with Anesthesia Associates. Some accepted and continued providing anesthesia services at St. Cloud Hospital.

In this action, plaintiffs assert that the sole-source contracts were part of a "grand conspiracy" by Minnesota anesthesiologists to eliminate nurse anesthetists as a class of lower-cost, equally competent competitors. The hospital defendants claim they independently decided to enter into these sole-source contracts to eliminate billing confusion and uncertainty, to significantly reduce costs, and to provide anesthesia services more efficiently. The anesthesiologist defendants deny conspiring to boycott nurse anesthetists or to eliminate them from a marketplace in which they continue to provide the same services as before. After substantial discovery, the district court granted summary judgment dismissing plaintiffs' multiple claims under Section 1 and

Section 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[4]  We review the grant of summary judgment *de novo*, reviewing the record in the light most favorable to the non-moving party.  See Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 343 (8th Cir. 1995).

## II.

Section 1 of the Sherman Act prohibits contracts and conspiracies "in restraint of trade."  15 U.S.C. § 1.  Most agreements are evaluated under the "rule of reason," a standard that asks whether the contract unreasonably restrains trade in a relevant product or geographic market.  Certain kinds of agreements are unlawful *per se* because they "will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances."  NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 133 (1998).  On appeal, plaintiffs misapply this basic Section 1 analysis by trying to fit defendants' conduct and agreements under antitrust precedents that simply do not apply.  Ironically, plaintiffs do not even mention the most relevant Section 1 precedents, cases dealing with the legality of exclusive dealing contracts.

Plaintiffs' primary theory on appeal is that the sole-source contracts are *per se* unlawful group boycotts because they prevent nurse anesthetists from performing anesthesia services at the defendant hospitals.  This theory is without merit, both legally and factually.  Legally, "group boycott" is a narrow category of *per se* violation, "limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor."  Indiana Dentists, 476 U.S. at 458; see also Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 296 (1985).  It is not an antitrust "boycott" when one supplier enters into an exclusive supply agreement with one customer, even though the

---

[4]Plaintiffs' complaint also alleged numerous causes of action under state law, but this appeal concerns only their federal antitrust claims.

supplier's competitors are "foreclosed" from that customer for the life of the contract. As the Supreme Court recently stated, "no boycott-related per se rule applies" to the decision "by a buyer to purchase goods or services from one supplier rather than another." NYNEX, 525 U.S. at 135. Moreover, as a factual matter, neither party to the exclusive dealing contracts in this case stopped dealing with nurse anesthetists. Both the hospitals and the anesthesiologists continued to seek out and use nurse anesthetist services, albeit on different contractual terms. Thus, we reject plaintiffs' theory that the sole-source contracts are *per se* unlawful boycotts as totally without merit. See Flegel v. Christian Hosp., 4 F.3d 682, 686-87 (8th Cir. 1993); see also Levine v. Central Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1549-51 (11th Cir.), cert. denied, 519 U.S. 820 (1996); BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n, 36 F.3d 664, 667-69 (7th Cir. 1994); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1411-12 (9th Cir.), cert. denied, 502 U.S. 994 (1991).

Next, plaintiffs argue that joint efforts by anesthesiologists to obtain sole-source contracts from hospitals were an unlawful boycott of nurse anesthetists. Plaintiffs label an October 1992 letter from counsel for the Minnesota Society of Anesthesiologists advising the Society's members as "a blueprint for eliminating [nurse anesthetists] as competitors under the pretext of quality of care concerns." Again, the theory is factually unsound: there is no evidence Minnesota anesthesiologists refused to do business with nurse anesthetists, or coerced hospitals to do so by threatening to withhold anesthesiological services. To be sure, as Indiana Dentists and other cases make clear, a society of professionals will run afoul of the antitrust laws when its rules or policies result in a horizontal agreement among members that achieves an anticompetitive objective. But we see nothing wrong with a society of medical professionals counseling its members as to what form of contractual relationships with hospitals might be in their self-interest, absent evidence that the society's members then collectively and coercively used market power to accomplish their objectives.

Next, plaintiffs suggest the defendant hospitals "conspired" with each other to boycott nurse anesthetists, based upon evidence that, after the Allina hospitals publicly announced their decision to sole-source their anesthesia services, St. Cloud Hospital administrators discussed this decision with Allina hospital administrators. But plaintiffs' own market analysis places the St. Cloud Hospital in a different geographic market than the Allina hospitals. Non-competing hospitals have no logical motive to "conspire" with each other concerning the way each organizes the anesthesia component of its surgery services. Thus, we agree with the district court that plaintiffs failed to present sufficient evidence of conspiracy, that is, evidence that "tends to exclude the possibility that the alleged conspirators acted independently." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Moreover, even if these non-competing hospital administrators did "agree" that sole-sourcing was the most desirable way to structure their surgeries, we see no evidence such an agreement restrained trade at all, much less unreasonably. Exchanges of information of this type tend to be, if anything, pro-competitive. From the hospitals' perspective, sole-sourcing did not eliminate their use of nurse anesthetists. It did eliminate the hospitals' problems when billing for nurse anesthetist but not anesthesiologist services, and sole-sourcing held out the promise that anesthesia services would be delivered more efficiently and cost effectively.

Putting aside plaintiffs' misguided boycott theories, we must nonetheless examine whether the sole-source contracts between the hospital defendants and the anesthesiologist defendants violate Section 1 of the Sherman Act. Exclusive dealing contracts are analyzed under the rule of reason. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 333-35 (1961). Though plaintiffs give us no help in this regard, the analysis is made easier by the Supreme Court's decision in Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984).

Jefferson Parish involved an exclusive contract between a New Orleans hospital and a group of anesthesiologists to provide anesthesia services at the hospital. The

agreement was challenged by an excluded anesthesiologist. The court of appeals ruled for the plaintiff, concluding the hospital had illegally "tied" anesthesia services to its other surgery services. The Supreme Court reversed. The Court's lead opinion applied its tying precedents and concluded, "there has been no showing that the market as a whole has been affected at all by the contract." 466 U.S. at 31. But the four concurring Justices concluded the tying precedents were inapplicable and analyzed whether this exclusive dealing contract was an unreasonable restraint on trade:

> Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers and sellers are frozen out of a market by the exclusive deal. When the sellers of services are numerous and mobile, and the number of buyers is large, exclusive-dealing arrangements of narrow scope pose no threat of adverse economic consequences. To the contrary, they may be substantially procompetitive by ensuring stable markets and encouraging long-term, mutually advantageous business relationships.
>
> At issue here is an exclusive-dealing arrangement between a firm of four anesthesiologists and one relatively small hospital. There is no suggestion that East Jefferson Hospital is likely to create a "bottleneck" in the availability of anesthesiologists that might deprive other hospitals of access to needed anesthesiological services, or that the [favored anesthesiologists] have unreasonably narrowed the range of choices available to other anesthesiologists in search of a hospital or patients that will buy their services. . . . Even without engaging in a detailed analysis of the size of the relevant markets we may readily conclude that there is no likelihood that the exclusive-dealing arrangement challenged here will either unreasonably enhance the hospital's market position relative to other hospitals, or unreasonably permit [the favored anesthesiologists] to acquire power relative to other anesthesiologists. Accordingly, this exclusive-dealing arrangement must be sustained under the rule of reason.

466 U.S. at 45-46 (O'Connor, J., concurring) (citations omitted). The parallel between this case and Jefferson Parish is both obvious and compelling. Although the excluded

plaintiffs here are nurse anesthetists, rather than competing anesthesiologists, plaintiffs present no evidence why that should affect the rule of reason analysis. Indeed, the exclusion in this case is less complete, because the favored anesthesiologists continued to use the services of nurse anesthetists previously employed by the hospitals.

Applying the rule of reason analysis from Jefferson Parish and other exclusive dealing cases, plaintiffs have proved neither that the defendants possess market power, nor that their acts have caused actual detrimental effects on competition in a relevant market. Plaintiffs' claim that the labor market for nurse anesthetist services has been injured because they have been forced to seek employment elsewhere. But as plaintiffs concede, given the mobility of these health care professionals, the proper geographic bounds of that market are nationwide. There is no assertion defendants have national market power, or that their acts have driven plaintiffs out of the nationwide market. Indeed, plaintiffs have made no showing that defendants have market power in the *local* labor market for anesthesia services. Midwest Anesthesia's membership includes less than eight percent of the Twin Cities anesthesiologists. Nurse anesthetists continue to provide anesthesia services at the defendant hospitals, and there is evidence those remaining earn more than they did as hospital employees. That plaintiffs have chosen to work elsewhere is not an antitrust injury, for at most it reflects only harm to individual competitors, not to competition. In essence, plaintiffs claim a right under the antitrust laws to access *all* hospital surgeries as independent, direct-billing professionals. That claim is without merit.

Plaintiffs also assert that patients (and their third-party insurers) have been deprived of a lower-cost alternative provider of anesthesia services. Jefferson Parish recognized a distinct product market for anesthesia services, in which patients are the purchasers. But plaintiffs have failed to prove actual adverse effects on competition in that market, such as increased prices for anesthesia services, or a decline in either the quality or quantity of such services available to surgery patients. Absent concrete evidence of this nature, plaintiffs must prove market power in a relevant geographic

market. They have utterly failed to do so. To be probative, geographic market evidence "must address where consumers could practicably go, not on where they actually go." FTC v. Tenet Health Care Corp., 186 F.3d 1045, 1052 (8th Cir. 1999). Plaintiffs' market share analysis focused on each hospital's trade area, but a seller's trade area is not necessarily the relevant geographic market for purposes of antitrust analysis. See Bathke, 64 F.3d at 346. Defendants' analysis allocated to each defendant hospital a local market share comparable to that of the defendant hospital in Jefferson Parish, which was held not to confer market power. Plaintiffs' expert assigned somewhat larger market shares, but nowhere near the dominant 84% share that justified the jury verdict for a nurse anesthetist plaintiff in Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1442 (9th Cir. 1988).

On this record, we conclude that defendants' exclusive sole-source contracts for providing anesthesia services at the Allina and St. Cloud hospitals are entitled to "the frequently expressed judicial approval of exclusive contracts for medical services." Balaklaw v. Lovell, 14 F.3d 793, 802 (2d Cir. 1994). Therefore, the district court properly granted summary judgment dismissing plaintiffs' Section 1 claims. As in Jefferson Parish and Midwest Radio Co. v. Forum Pub. Co., 942 F.2d 1294, 1297 (8th Cir. 1991), plaintiffs' failure to prove market power, or a dangerous probability that defendants will acquire market power, defeats their other antitrust claims of tying, essential facilities, and Section 2 violations, claims they virtually abandon on appeal. Accordingly, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-10-