**WOMAN'S CLINIC, INC., Elizabeth Campbell, M.D., Donald P. Kratz, M.D., Darren Lehnert, M.D., David L. Redfern, M.D., J. Christopher Stein, M.D., Thomas D. McClain, M.D., and Thomas D. McClain M.D. Orthopedic Surgery, L.L.C., Plaintiffs,**

v.

**ST. JOHN'S HEALTH SYSTEM, INC., St. John's Physicians and Clinics, Inc., f/k/a St. John's Health Systems, Inc., Defendants.**

**No. 01–3245–CV–S–GAF.**

United States District Court,
W.D. Missouri,
Southern Division.

Nov. 12, 2002.

Allen Allred, Thompson Coburn, Jeffrey R. Fink, St. Louis, MO, Frank M. Evans, III, Mark A. Fletcher, Lathrop & Gage, L.C., Springfield, MO, David Marx, Jr., Sandra A. Muhlenbeck, Jennifer K. Schott, McDermott, Will & Emery, Chicago, IL, for St. John's Health System, Inc.

Michael J. Cordonnier, Cunningham, Harpool & Cordonnier, Springfield, IL, for Primrose Healthcare Services, Inc.

S. Jay Dobbs, Mark Kermit Fendler, Randy S. Gerber, Polsinelli, Shalton & Welte, P.C., St. Louis, MO, Joseph Clayton Greene, Ben K. Upp, Husch & Eppenberger, LLC, Springfield, MO, David W. Harlan, Senniger, Powers, Leavitt & Roedel, St. Louis, MO, Michelle N. Leonard, Prime, Inc., Springfield, MO, for Orthopedic Surgery, L.L.C.

Gretchen Garrison, Stinson, Morrison, Hecker LLP, St. Louis, MO, for Cox Health Systems Insurance Co.

Jeffrey J. Simon, Husch & Eppenberger, LLC, Kansas City, MO, for Mid America Health Network, Inc.

Daniel K. Wooten, Neale & Newman, L.L.P., Springfield, MO, for Med–Pay, Inc.

## ORDER

FENNER, District Judge.

Presently before the Court is Defendant St. John's Health System, Inc., and St. John's Physicians and Clinics, Inc. ("St. John")'s Motion for Summary Judgment. Also pending is Plaintiff Woman's Clinic, *et al.* ("Woman's Clinic")'s Motion for Partial Summary Judgment.[1] These motions arise from a case filed in this Court by Woman's Clinic alleging that St. John's engaged in anticompetitive behavior in that St. John's has vertically integrated its health care network through exclusive contracts and that a Business Covenant between St. John's and plaintiff physicians prohibits plaintiff physicians from investing in or operating ambulatory surgical centers, birthing centers, mammography clinics, or other operations for which the physicians could charge a facility fee. The crux of Woman's Clinic's complaint is that these behaviors inhibit competition within the Springfield, Missouri medical community by making it difficult for the plaintiff physicians to practice medicine were they to be disassociated from the St. John's network. Additionally, Woman's Clinic, in its Complaint, sought a declaration by this Court that St. John's was breaching the terms of the Affiliation Agreement, entered into with the plaintiff physicians, by not directing referrals to plaintiff physi-

---

1. Also included with Woman's Clinic are the individual physicians who own and operate Woman's Clinic. These physicians will hereinafter be collectively referred to as "plaintiff physicians".

cians, and by not guaranteeing network admittance to new physicians hired by Woman's Clinic.

After reviewing the voluminous exhibits submitted by Woman's Clinic, the Court concludes that no genuine issue of material fact exists as to whether the activities of St. John's violate the Sherman Act antitrust provisions or Missouri state law. Even resolving all inferences and credibility issues in favor of the plaintiff, Woman's Clinic has failed to prove that the conduct of St. John's offends the Rule of Reason and, therefore, St. John's is entitled to judgment as a matter of law. The Court also determines that declaratory relief is not a proper remedy for Woman's Clinic in this case.

## DISCUSSION

### I. Standard

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States,* 600 F.2d 725, 727–28 (8th Cir.1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning,* 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter,* 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also City of Mt. Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the absence of genuine issues of material fact. However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in the pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

At the summary judgment stage the judge's function is not to weigh the credibility of the evidence, but rather to determine whether a genuine issue of material fact exists. *Id.* A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence

favoring the nonmoving party must be more than "merely colorable." *Id.*, 106 S.Ct. at 2511. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted).

## II. Facts

Plaintiffs in this case are comprised of Woman's Clinic, Inc., an obstetrics and gynecological ("OB–GYN") clinic as well as the physicians who work in the clinic. Also included with the plaintiffs is Thomas D. McClain, M.D. Orthopedic Surgery., L.L.C. Defendant St. John's is a network of health care providers, insurance providers, and health care facilities. St. John's Regional Health Center is a 663 bed, tertiary care unit located in Springfield, Missouri. St. John's Physicians and Clinics, Inc. is a non-profit corporation which is comprised of physicians who provide medical services for patients in the Springfield community. St. John's Health System is the larger non-profit corporation which operates St. John's Regional and is the parent company of St. John's Physicians and Clinics, Inc.

In 1994, St. John's embarked on a campaign to enlarge its health care network within the Springfield community. To this end, St. John's sought to contract and/or affiliate with providers and insurers in an effort to establish relationships with third party payors. "Providers" are the medical doctors that render health care to patients. "Payors" refers to the entities that make payments for medical care on behalf of the members of their coverage plans. Included within the group of "payors" are government-financed entities such as Medicare and Medicaid; self-paying individuals

who have no health insurance coverage; and the commercial payors such as Blue Cross/Blue Shield, as well as independent provider networks who organize providers and make them available to insurance carriers, self-funded or insured groups, and employers.

In order to develop its multi-provider network, St. John's began to purchase the medical practices of physicians in the surrounding community, including the Woman's Clinic. St. John's sought to increase its services in the OB–GYN areas as well as providing mammographies which Woman's Clinic was doing at that time. In 1994, St. John's purchased the Woman's Clinic and the plaintiff physicians became employees of St. John's.[2] As part of the purchase of the Woman's Clinic and the hiring of the Woman's Clinic physicians, St. John's received from the physicians covenants not to compete should they ever leave the St. John's network. The physicians covenanted that they would not practice medicine in competition with St. John's within a twenty-five mile radius of St. John's Regional for two years.

Once employed by St. John's, the plaintiff physicians had access to the St. John's healthcare network. The major boon to the Woman's Clinic was that it received patient referrals from payors that contracted with the St. John's network. Payors who are contracted with St. John's provide financial incentives for individuals enrolled in their plans to see in-network physicians and financial disincentives to see out-of-network physicians. For example, a payor may offer to pay for 90% of the cost of services provided by an in-network physician, meaning a physician employed by or affiliated with the St. John's network. Patients may choose to see a physician out-of-network; not employed by or affiliated with St. John's,

---

**2.** St. John's also purchased the Thomas D.     McClain Orthopedic Surgery Center.

however in those cases the payor may only pay for 70% of the cost of the service. By providing these financial incentives (or disincentives, depending upon perspective) payors can obtain greater reductions in costs from providers and receive volume discounts.

As part of the agreement between the St. John's network and the payors, the payors promise that they will exclusively prefer St. John's providers and facilities. This does not preclude payors from paying for out-of-network services. What it means is that each payor has a preferred provider panel from which enrollees can select. Patients who see these preferred providers receive greater benefits from the plan. The payor agreements may be terminated with the appropriate notice, usually 90 days. Unless terminated, the payor contracts automatically renew for another year.

Payors are free to switch to other health care providers including the Cox network, the other major health care provider in Springfield. Additionally, payors may contract with independent physicians who are not members of the payor's provider panel, assuming that St. John's grants its permission to the independent physicians to solicit payor contracts. Providers not affiliated with St. John's also have the option of contracting with the Cox network to provide services.

Once St. John's purchased Woman's Clinic, St. John's received the benefit of patient access brought by Woman's Clinic and the Woman's Clinic providers obtained access to patients whose payors contracted with St. John's. From the evidence, the plaintiff physicians received favorable remunerations during their employ with St. John's. However, in 1999, St. John's undertook a restructuring that allowed plaintiff physicians the option of repurchasing the Woman's Clinic, but without the mammography clinic and the orthopedic surgery

clinic. Apparently St. John's was unwilling to resell the mammography clinic and the orthopedic surgery clinic because it was considering expanding its own ambulatory surgery and mammography services. Plaintiff physicians chose to repurchase the clinic, minus the surgery center and the mammography clinic.

As part of the resale of the clinic, St. John's and plaintiff physicians entered into a Transition Agreement. Under the new agreement, plaintiff physicians would no longer be bound by the original covenants not to compete found in the employment contracts. Plaintiff physicians would instead be obligated under a new Business Covenant. The terms of the Business Covenant provided that for a term of five years, plaintiff physicians could practice medicine in the Springfield area, but could not invest in or operate any ambulatory surgical center, birthing center, and freestanding lab or diagnostic service clinic including mammography and ultrasound.

Currently, plaintiff physicians are still affiliated with the St. John's network. However, plaintiff physicians perceive that they may be in danger of losing that affiliation. Plaintiff physicians fear that they will be foreclosed from the Springfield market because of, what they describe as, St. John's "exclusive" vertical network arrangement as well as the Business Covenant restricting plaintiff physicians' medical practice options. In response to these perceived dangers, Woman's Clinic filed the immediate action. Woman's Clinic asks this Court to find that the actions of St. John's, by vertically integrating its network through exclusive contracts with payors and by restricting plaintiff's ability to start an ambulatory surgical center or mammography clinic, has violated federal and state antitrust laws.

St. John's filed the present Motion for Summary Judgment alleging that Wom-

an's Clinic could not prevail on any of its four counts stated in the Complaint. The antitrust claims, Counts I, II, and III break down into allegations of violations with respect to two practices; 1) the vertical integration structure of St. John's, and 2) the Business Covenant entered with plaintiff physicians. Woman's Clinic alleges that the structure of the St. John's network is an illegal restraint of trade. Woman's Clinic further alleges that the Business Covenant is a horizontal market allocation. Both allegations assert violations of the Sherman Antitrust Act, 15 U.S.C. § 1.[3] The remaining Count IV pertains to a claim for declaratory relief that St. John's is breaching the affiliation agreement with Woman's Clinic.

St. John's counters that Woman's Clinic is unable to meet its burden of proof under the Rule of Reason with regard to both antitrust claims and, therefore, summary judgment is appropriate. As to Count IV, St. John's asserts that the prayer for declaratory relief is really a claim for breach of contract. St. John's avers that because Woman's Clinic has not pled damages, an essential element, there can be no relief for Woman's Clinic on this claim and declaratory relief is inappropriate. For the reasons set forth below, summary judgment is GRANTED in favor of St. John's on Counts I, II, and III; the antitrust claims. Summary judgment is also GRANTED with respect to the declaratory breach of contract claim. Woman's Clinic's Motion for Partial Summary Judgment is DENIED.

## III. Analysis

At the outset, Woman's Clinic argues that all of St. John's conduct should be considered collectively when determining whether Woman's Clinic has proved its antitrust claims. Woman's Clinic alleges that everything St. John's and Cox does establishes that the Springfield medical market is completely foreclosed from entry by independent or non-affiliated physicians. In support of this contention, Woman's Clinic cites to *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) for the proposition that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* at 698–99, 82 S.Ct. 1404. However, that proposition is not applicable in this case.

Under *Union Carbide,* a conspiracy must be considered in totality. In this case however, there is no conspiracy. Woman's Clinic strenuously asserts throughout its 120 page brief that the actions of St. John's and Cox foreclose the market. However, neither Cox nor its subsidiaries, nor its affiliates have ever been named in this lawsuit. For that reason, the conduct of Cox, as far as it pertains to allegations of antitrust violations, is completely irrelevant. Because of this, there is no conspiracy to be evaluated. Woman's Clinic has three different theories upon which it may prevail that St. John's has violated antitrust laws; 1) that St. John's vertical network and the Business Covenant unreasonably restrain trade; 2) that the Business Covenant is a *per se* invalid market allocation; and 3) that the Business Covenant violates Missouri antitrust statutes. Woman's Clinic may succeed on all of its theories, some of its theories, or none at all. However, each theory must be evaluated independent of the other. *See Intergraph Corp. v. Intel*

---

**3.** Count III alleges that St. John's has violated Missouri's antitrust laws found at Mo.Rev. Stat. § 416.031. Missouri's antitrust laws are almost identical the Sherman Antitrust Act, hence the reasoning of all federal antitrust cases will be equally applicable to state claims.

*Corp.,* 195 F.3d 1346, 1367 (Fed.Cir.1999) (stating that "[e]ach legal theory must be examined for its sufficiency and applicability[.]") Having so stated, each theory will be examined individually.

## A. St. John's "Exclusive" Vertical Integration as a Restraint of Trade

█ In Count I, Woman's Clinic asserts that St. John's has illegally restrained trade by entering into exclusive contracts with payors. Woman's Clinic also alleges that the Business Covenant entered into with the plaintiff physicians is an illegal restraint of trade.[4] Such claims must be evaluated under the Rule of Reason. Even when viewing the evidence in a favorable light to the plaintiff, Woman's Clinic has failed to meet its burden under the Rule of Reason analysis.

█ Exclusive dealing contracts are evaluated under the Rule of Reason. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 333–35, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). *Accord Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.,* 208 F.3d 655, 660 (8th Cir.2000). The Rule of Reason involves an inquiry into a defendant's market power within a given market structure. *Double D Spotting Service, Inc. v. Supervalu, Inc.,* 136 F.3d 554, 560 (8th Cir.1998). The antitrust laws are aimed at exclusive agreements which have detrimental effects on competition or have the potential for adverse market impacts. *Levine v. Central Florida Med. Affiliates, Inc.,* 72 F.3d 1538, 1551 (11th Cir.1996). Accordingly, an exclusive dealing agreement can be invalidated upon either a showing of actual detrimental impacts on competition or upon a showing of substantial market power sufficient to foreclose competition. *F.T.C. v. Indiana Fed'n of*

*Dentists,* 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). *Accord Ryko Manuf. Co. v. Eden Servs.,* 823 F.2d 1215, 1233 (8th Cir.1987). Thus, Woman's Clinic can prevail if any genuine issues of material fact exist as to whether the exclusive agreements between St. John's and its payors actually, detrimentally, impact competition, or if St. John's·has sufficient market power. Woman's Clinic has shown neither.

At the outset, the Court recognizes that there are actual agreements between St. John's which are purportedly exclusive. The significance of this is that the Court need not look to a pattern of behavior or practices. *See Dillon Materials Handling v. Albion Indus.,* 567 F.2d 1299, 1302 (5th Cir.1978) (stating that an exclusive dealing agreement could be inferred from conduct of parties). In this case, there is an express agreement between St. John's and its payors and the language of such an agreement governs the decision. The putative exclusive agreements generally state as follows:

> During the term of this Agreement, Payor agrees not to enter into, either directly or indirectly, any other agreement for the provision of health services for Payor's employees or dependants with any other provider, insurance carrier, health maintenance organization, preferred provider organization, and/or hospital-physician organization located in or doing business in the service area outlined and defined ... except for Covered Services not available through St. John's.

While this appears to be an exclusive dealing agreement, nowhere does it prevent the payor from paying for services that its enrollees receive outside the St. John's

---

4. The Business Covenant is also the subject of Counts II and III and will be discussed more fully below.

network. The payors may offer incentives to stay in-network; however if the patient or enrollee elects to see an out-of-network physician, the payor is bound to ·pay the agreed upon amount for out-of-network care. Furthermore, physicians who no longer associate with St. John's may still treat patients enrolled in the St. John's network. The individual · patients may · have to pay more out of pocket, but they are not precluded from seeing an out-of-network physician by the "exclusive" agreement of the patient's payor. These facts indicate that the agreement between St. John's and its payors is not the type of "exclusive" agreement with which the antitrust laws are concerned. ·

Further evidence that the Sherman Act was not designed to curtail this type of practice is the fact that payors can and have left the St. John's network to contract with one of St. John's competitors. The contracts between St. John's and the payors contain a provision for the termination of the agreement. While the terms vary, a typical termination clause reads as follows:

> Contract Hospital [St. John's] or payor may terminate this Contract by giving the other party at least sixty (60) days written notice prior to the effective date of termination and provided that the termination shall take effect on the sixtieth (60th) day after the anniversary date of the Contract.[5]

The ability to cancel the contract on relatively short notice indicates the benign nature of any exclusive effect.[6] Such a power on the part of the payor would prohibit St. John's from unfairly raising prices or lowering output because the payor could terminate the agreement in a relatively short period of time. *See U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 596 (1st Cir.1993) (stating that a short termination period on an exclusive arrangement general indicates a *de minimus* restraint on competition). In the Springfield market, if a payor terminates its contract with· St. John's, it has the option of contracting with Cox, perhaps on more favorable terms. To combat this, St. John's is motivated to keep premiums low as well as keep enrollees satisfied. This is the very nature of competition.

■ Nevertheless, the plaintiff physicians allege that if their affiliation with St. John's were terminated, they would be foreclosed from the Springfield market because of these "exclusive" contracts. While the Court is dubious as to the exclusive nature of the payor agreements, the Court will nevertheless assume for purposes of this motion that the contracts are exclusive. In order to establish that a system of exclusive arrangements violates antitrust laws, the plaintiff must show either actual harm to competition or sufficient market power to presume competition would be injured. *See Minnesota Ass'n of Nurse Anesthetists,* 208 F.3d at

**5.** Some of the contracts were terminable upon twenty days notice, others upon ninety days notice.

**6.** Woman's Clinic asserts it has factually disputed the ability to terminate the contracts and has shown that contracts are *de facto* long term contracts because of automatic renewal provisions and because few payors actually terminate their contracts with St. John's. Woman's Clinic argues that several additional factual disputes preclude summary

judgment. Though perhaps disputed, these facts are not material. It is true the contracts with St. John's and the payors automatically renew, unless terminated. The simple fact is that payors have the power to terminate contracts if they feel such action is warranted. Whether payors have or have not terminated or switched is not a material dispute. Even if no payors have ever switched, that does not establish any harm to competition. In fact, it likely suggests the opposite; that competition is keeping payors satisfied.

662 (stating that when plaintiffs failed to prove actual adverse effects on competition, they were forced to prove market power in a relevant geographic market).

Woman's Clinic asserts that it has established a violation of the antitrust laws based on the conclusion of its expert, James Lagenfeld, that between St. John's and Cox, the Springfield medical market is almost totally foreclosed. This, says Woman's Clinic, is sufficient to preclude an inquiry into market power. The Court has read both of Lagenfeld's reports and finds them completely irrelevant to this issue. Lagenfeld erroneously included the activities of Cox in his calculations. As mentioned earlier, what Cox does has absolutely no bearing on a case in which Cox has not been named a defendant. Any wrongdoing on the part of Cox cannot be imputed to St. John's and vice versa. The only relevant issue is the exclusive contracts made between St. John's and its payors.

■ Outside these bald, erroneous, assertions that almost all of the Springfield market is totally foreclosed, Plaintiffs present no evidence to support their claims of foreclosure. Therefore, there is no actual evidence, and the Court is unable to find an antitrust violation on the basis of foreclosure rates. This leaves Woman's Clinic to show that St. John's has sufficient market share so as to potentially foreclose the market.

The first step in determining market power is to identify the relevant product and geographic markets. *Double D*, 136 F.3d at 560. This burden falls on the plaintiff. *Id.* Woman's Clinic's expert hypothesizes, and the parties do not dispute that, for purposes of this motion, the relevant product market is OB–GYN services and the geographic market is the 12 county area around Springfield.

As to proof of market power, Woman's Clinic alleges that, based on Lagenfeld's report, St. John's has employed or contracted with 56% of the OB–GYN physicians in the Springfield market. Woman's Clinic conclusively states that this establishes market power. However, the data relied upon by Lagenfeld contradicts Woman's Clinic's assertions.

According to Lagenfeld's data, St. John's either employs or contracts with 27 OB–GYN physicians in the Springfield market. See May 13, 2002 Report of Dr. James Lagenfeld, *Plaintiff's Suggestions in Opposition*, Volume III, Exhibit 6. However, 13 of those physicians have courtesy privileges with St. John's but are not members of St. John's network. Therefore it is more accurate to say that St. John's is associated with 14 OB–GYN physicians. There are a total of 45 OB–GYN physicians in the relevant market area.[7] This leaves 31% of the OB–GYN physicians under contract with St. John's. If the risk is harm to the OB–GYN physician market, St. John's 31% share of the OB–GYN physicians is hardly indicative of power sufficient to unilaterally reduce output or increase prices without losing patients to competitors.

If the alleged risk is harm to patient choice, nowhere does Plaintiff's data ever produce the percent of OB–GYN patients treated by St. John's. The data does show that St. John's has 35% market share over-

---

7. In his report, Dr. Lagenfeld used OB–GYN physician data from a 21–county region around Springfield. This accounted for 48 OB–GYN physicians. Three of those 48 physicians are not in the 12–county area being used as the relevant geographic market. Of those three, two had affiliation with Cox, and the other was, presumably, affiliated elsewhere. In the end, this difference only effected the total number of physicians and not the number of St. John's physicians used to calculate the percent of OB–GYN physicians affiliated with St. John's

all, but does not specify what percent actually utilize the relevant market in question, OB–GYN services. Even assuming the 35% is a representative market share of OB–GYN patients, the Court finds that this does not equal sufficient market power to constitute an antitrust violation. *See Sewell Plastics, Inc. v. Coca–Cola Co.*, 720 F.Supp. 1196, 1212–13 (W.D.N.C.1989) (finding that 40% of market share did not constitute market power); *Hassan v. Independent Practice Assc.*, 698 F.Supp. 679, 696 (E.D.Mich.1988) (finding that physicians group with 20% share of relevant market was not sufficient market power); *Kuck v. Bensen*, 647 F.Supp. 743, 746 (D.Me.1986) (concluding that hospital did not have market power in emergency services market where it only handled 37% of emergency room volume); *and Gonzalez v. Insignares*, 1985–2 Trade Cas. (CCH) ¶ 66,701, 1985 WL 2206 (N.D.Ga.1985) (stating that hospital controlling 40% of the relevant market was not sufficient market power to make exclusive agreement anticompetitive). Even assuming that the contract between St. John's and the payors are exclusive, St. John's simply does not have enough market power to presume that the exclusive contracts will impair competition because 65% of the market share is still available.[8]

In sum, the Court doubts the agreements between St. John's and the payors are the types of "exclusive" agreements which the antitrust statutes are designed to remedy. The payors' ability to terminate the contract and the ability of enrollees to see physicians out-of-network supports this conclusion. Even assuming the exclusivity of the agreements, Woman's Clinic has failed to show that there is any actual detrimental foreclosure or that St. John's has sufficient market power so as to warrant antitrust concerns.[9]

## B. The Business Covenant as a Horizontal Market Allocation

Count II of Woman's Clinic's Complaint alleges that the Business Covenant, entered into between St. John's and plaintiff physicians prior to the resale of the Woman's Clinic is a horizontal market allocation that is illegal *per se* under the Sherman Antitrust Act. Woman's Clinic argues that the Business Covenant prohibiting it from operating an ambulatory surgery center or a mammography clinic for five years is a naked restraint on competition. As such, Woman's Clinic contends the Business Covenant must be invalidated without any inquiry into the actual or potential effects on competition. St. John's counters that

8. Woman's Clinic asserts that the Cox network is closed to the plaintiff physicians, and therefore all the market is foreclosed. The fact that some plaintiff physicians have applied and been turned down by Cox does not mean the network is closed. It only means that the Cox network has no need for more OB–GYN physicians.

9. Because Woman's Clinic has devoted so much of its case to tying the conduct of the Cox network into this lawsuit, it bears repeating once more: the conduct of Cox is irrelevant. When one player in any given market begins to consolidate downstream distributors into a network, it is only natural that the other players in the market follow suit. Where antitrust becomes concerned is when

upstream and downstream competition is cut off. In this case, there is upstream competition between Cox and St. John's for payor contracts. There is also downstream competition for physician referrals within the two respective networks. While Woman's Clinic disputes whether the competition is "vigorous" the fact is that Cox and St. John's are competitors for the same market of payor contracts. If anything has been "vigorous" is Woman's Clinic's attempt to obfuscate this matter by bombarding the Court with pounds of arguably irrelevant information. Plaintiff physicians should heed the following well: antitrust is concerned with the protection of competition, not individual competitors. *Ryko*, 823 F.2d at 1234.

the Business Covenant was ancillary to the agreement to resell the Woman's Clinic to the plaintiff physicians. Accordingly, St. John's presses that the Business Covenant must be evaluated under the Rule of Reason.

■ When analyzing horizontal agreements, it is useful to attempt to classify the agreement as either a "naked restraint" or an "ancillary agreement." XI Herbert D. Hovenkamp, *Antitrust Law,* ¶ 1904 (1998). Naked restraints are so pernicious in their effect on competition and so blatantly inapposite to the true function of a competitive market that their existence is routinely condemned as *per se* illegal. *Dunafon v. Delaware McDonald's Corp.,* 691 F.Supp. 1232, 1241 (W.D.Mo. 1988) (citing *N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). Naked restraints are generally formed with the objectively intended purpose or likely effect of increasing prices or decreasing output. *See* XI Hovenkamp, ¶ 1906. If an agreement is a naked restraint, neither the relevant market nor market power need be proven. *Id.* at ¶ 1910. The harmful effects of the agreement will instead be presumed. *Id.*

■ Ancillary agreements, by contrast, are agreements that, while horizontal, have the potential to promote competition. *Polk Bros. Inc. v. Forest City Enter.,* 776 F.2d 185, 189 (7th Cir.1985). These agreements are usually 1) between the seller of property or business and the buyer not to compete with the buyer in such a way as to detract from the value of the property just sold; or 2) between the buyer and seller of property or a business not to use the purchased property in competition with the business retained by the seller. *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 281 (6th Cir.1898) (*aff'd as modified* by *Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899)). In order to determine whether a horizontal agreement is ancillary, the court must determine whether at the time the agreement was made, it was necessary to promote the enterprise and productivity of an underlying arrangement. *Polk Bros.,* 776 F.2d at 189.

■ In the present case, Woman's Clinic argues that the Business Covenant is a naked restraint on competition because it "1) it was entered into years after the Employment Agreements to which it is supposedly ancillary; 2) imposes restraints unnecessary and unrelated to the procompetitive aspects of the Employment Agreements; and 3) plainly restricts output." *Plaintiff's Suggestions in Opposition,* at 49. Based on a review of the facts of this case, it appears to the Court that the Business Covenant is not ancillary to the Employment Agreement, but rather is ancillary to the Transition Agreement which was to govern the plaintiff physicians' repurchase of the Woman's Clinic.

The relevant facts are these: In 1999, St. John's undertook a restructuring program after concerns were raised in regard to administration and management. As part of the restructuring, plaintiff physicians were given the option of 1) remaining with St. John's under an amended covenant not to compete; 2) remaining with St. John's under the same Employment Covenant; or 3) terminating their employment with St. John's, repurchasing Woman's Clinic, and entering into a Transition Agreement and Affiliation Agreement with St. John's. The plaintiff physicians opted to terminate their employment and repurchase the Woman's Clinic. The plaintiff physicians then entered into the Transition Agreement whereby the plaintiff physicians became affiliates of the St. John's network instead of employees. For its part, St. John's waived the original noncompete agreement contained in the em-

ployment agreements which prevented plaintiff physicians from practicing medicine. In the Transition Agreement, the plaintiff physicians were instead restricted by the Business Covenant which allowed the plaintiff physicians to continue practicing medicine, but prohibited them from investing in or operating, among other things, an ambulatory surgery center and a mammography clinic.

Based on these facts, the Business Covenant was ancillary to the Transition Agreement. The new Business Covenant was necessary because, for one, it allowed the plaintiff physicians to practice medicine. It would be folly for the plaintiff physicians to have repurchased the Woman's Clinic when they were barred from practicing medicine. Moreover, the Covenant was need to ensure a successful transition from employees to affiliates. This was not a situation where the underlying arrangement was completed, as is argued by Woman's Clinic. The transition from employees to affiliates was ongoing. *Compare Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir.1995) (finding that covenant not to compete with advertising was not ancillary to partnership dissolution because a judge had already ordered the partnership dissolved before the creation of the covenant). This indicates the ancillary nature of the Business Covenant. Additionally, by allowing the plaintiff physicians to practice medicine, the Business Covenant increases competition, allowing more physicians to compete for patient referrals. Thus the Business Covenant does not have the earmarks of a naked restraint on trade. It is rather ancillary to the Transition Agreement and must be evaluated under the Rule of Reason.

■■■ The Business Covenant is not invalid under the Rule of Reason for the same reason the vertical arrangement of St. John's was not invalid.[10] The Court notes that Woman's Clinic has satisfied even less of its burden with respect to this argument. Beyond not proving that St. John's has market power, Woman's Clinic has failed to even establish the relevant market. Because the Business Covenant pertains to the delivery of medical care besides OB–GYN services, the OB–GYN market is no longer appropriate. Given this difference, a new market is required and Woman's Clinic has failed to allege what the new market would be. Without this proof, Woman's Clinic's claims under Count II must fail.

## C. The Business Covenant Under Missouri Law

■■■ As to Count III, Plaintiff Woman's Clinic alleges that the Business Covenant is not valid because it does not protect a valid interest under Missouri law, Mo.Rev.Stat. § 416.031. Generally, satisfaction of the federal antitrust statutes will satisfy state antitrust laws. However, some states still adhere to the common law of trade restraints condemning "unreasonable" non-compete agreements. XIV Hovenkamp, at ¶ 2418. Under Missouri law, a covenant not to compete is unreasonable if, in addition to being ancillary to a valid underlying agreement, the covenant is not reasonably limited in scope to protecting the covenatee's legitimate interest. *Renal Treatment Ctrs.–Missouri, Inc. v. Braxton*, 945 S.W.2d 557, 563 (Mo.Ct.App.1997).

■■■ Covenants not to compete are found in a variety of relationships including employer/employee relationships and buyer/seller relationships. *Id.* The importance of identifying the type of relationship is that it allows the court to determine what legitimate interests may be at stake. In the employer/employee context, the le-

---

**10.** Thus summary judgment is also granted in favor of St. John's to the extent Woman's Clinic claimed the Business Covenant was an alleged restraint on trade in Count I.

gitimate concerns include protecting customer contacts and protecting trade secrets. *Schmersahl, Treloar, & Co. v. McHugh,* 28 S.W.3d 345, 349 (Mo.Ct.App. 2000). In the context of a buyer/seller relationship, particularly the relationship between the buyer and seller of a business, the interests include maintaining the good will of the business for the buyer, and protecting any business interest retained by the seller. *See e.g. Schnucks Twenty–Five, Inc. v. Bettendorf,* 595 S.W.2d 279, 286 (Mo.Ct.App.1979) (upholding promise by seller not to enter into grocery business under seller's surname in competition with buyer) *and Amer. Strawboard Co. v. Haldeman Paper Co.,* 83 F. 619, 624 (6th Cir.1897) (upholding covenant by operator of paper mill not to produce certain type of paper products in competition with owner).

According to Woman's Clinic, the Business Covenant does not protect any of the legitimate interests of an employer/employee relationship. Woman's Clinic asserts that St. John's has admitted as much by its "damning" admission that "[t]he revised covenant .. separates limitations on the professional practice of medicine from *potential future business relationships* that could harm St. John's[.]" Plaintiff's Suggestions in Support of Partial Motion for Summary Judgment at 16. (emphasis supplied in original). Thus, says Woman's Clinic, St. John's only seeks to prohibit future competition.[11]

What Woman's Clinic ignores is that the current relationship between St. John's and the plaintiff physicians is not an employer/employee relationship. It is true that the plaintiff physicians were employees of St. John's. It is also true that at one time there was a non-competition agreement that was part of the employ-ment contract. Plaintiff physicians have since decided to terminate their employ. The non-compete agreement which was ancillary to the employment contracts of the plaintiff physicians has been waived. Instead, the current Business Covenant is ancillary to a Transition Agreement for the sale of a business, namely, the Woman's Clinic. Since the Business Covenant is ancillary to the re-sale of the Woman's Clinic to the plaintiff physicians from St. John's, the relevant, legitimate concerns are those that are concomitant with a buyer/seller relationship, not an employer/employee relationship. As such, St. John's has a legitimate interest in protecting its retained business.

It is important to remember that St. John's is not selling back all of the Woman's Clinic. It retained for itself the mammography and orthopedic surgery clinics. It is therefore legitimate for St. John's to seek to protect the value of an asset recently purchased. *See Addyston Pipe,* 85 F. at 281 (finding that covenants not to compete have been upheld in situations were the buyer of a property promises "not to use the same in competition with the business retained by the seller[.]"). Having found that the covenant protects a legitimate interest of St. John's, the question remains whether the covenant is reasonable in terms of duration and geographic scope.

■ Based on case law, the five year duration of the covenant, and the 25–mile radius that is geographically encompassed are both reasonable to protect St. John's interest. "Temporary and spatially limited restraints are enforceable if reasonable under all attending circumstances[.]" *Schott v. Beussink,* 950 S.W.2d 621, 626 (Mo.Ct.

11. The Court asks, perhaps not so rhetorically, is that not the function of *all* non-compete agreements? To say that a covenant not to compete is invalid because it prohibits future competition would be to invalidate every single non-compete agreement ever entered into, without regard to reasonableness or legitimate interests.

App.1997). Whether a spacial or geographic restriction is reasonable will depend on whether the restriction is no greater than necessary to protect the legitimate interest at stake. *Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 400 (Mo.Ct.App.1980). Given that the relevant market for St. John's services has been established to be the 25–mile radius of St. John's Regional, a restriction on the plaintiff physicians from operating mammography or ambulatory surgery centers within that area appears to the Court to be no broader than necessary to protect St. John's business. *See Orchard Container Corp. v. Orchard,* 601 S.W.2d 299 (Mo.Ct. App.1980) (upholding a 125–mile radius restriction as reasonable given the placement of the customers). Additionally, the five year time period of the restriction does not appear to cause any concerns as being overly broad. *See Mills v. Murray,* 472 S.W.2d 6 (Mo.Ct.App.1971) (finding a restriction on competition for three years to be reasonable); *and Schnucks Twenty–Five,* 595 S.W.2d at 285 (upholding ten-year restriction period as reasonable). Because the Covenant is reasonable, it does not violate Missouri law. No genuine issues of material fact remain and St. John's is entitled to judgment as a matter of law on the claim that the Business Covenant violates Missouri law.

Woman's Clinic filed a cross-motion for partial summary judgment asserting that there was no genuine issue of material fact that the Business Covenant was a naked restraint on trade and *per se* invalid. The arguments in support of this motion were virtually identical to the arguments in opposition to St. John's motion for summary judgment. Having concluded that the Business Covenant is ancillary to the Transition Agreement and that the Rule of Reason applies, it necessarily follows that a *per se* treatment is inapplicable. Plaintiff's motion for partial summary judgment is therefore DENIED.

## D. Declaratory Judgment Relief

▮ In its final claim, Woman's Clinic asks this Court to declare 1) that St. John's is breaching the Affiliation Agreement through a prejudicial referral system; and 2) that St. John's is breaching the Affiliation Agreement by not guaranteeing network affiliation for any new physicians hired by Woman's Clinic. Woman's Clinic claims that these actions have hindered the physician plaintiffs, however Woman's Clinic makes no request for damages nor does Woman's Clinic seek any injunctive relief to stop St. John's. Woman's Clinic simply requests that this Court declare St. John's is breaching the Affiliation Agreement.

There is a dispute over whether the federal Declaratory Judgment Act, 28 U.S.C. § 2201, or the Missouri Declaratory Judgment Act, Mo.Rev.Stat. 527.010 should govern this claim, but this dispute need not detain the Court long. The case which St. John's uses to support its claim that the federal statute governs is not controlling here because this is not a diversity case. Instead, jurisdiction of this Court was founded upon federal question jurisdiction as provided in 28 U.S.C. § 1331. Briefly stated, the declaratory judgment claim of Count IV is a supplemental state law claim brought as part of the federal antitrust action. *See* 28 U.S.C. § 1367. Thus, Missouri law controls on the declaratory judgment claim.

Under Missouri law, a valid plea for declaratory relief requires three things; 1) the existence of a justiciable controversy; 2) the presence of a legally protectable interest; and 3) the existence of a question ripe for judicial decision. *Lake Ozark Constr. Indus., Inc. v. North Port Assoc.,* 859 S.W.2d 710, 714 (Mo.Ct.App.1993). Having said that much, it is also true that a declaratory judgment remedy is not a panacea for any real or imagined legal ills. *Cronin v. State Farm Fire & Cas. Co.,* 958

S.W.2d 583, 587 (Mo.Ct.App.1997). Absent an exceptional circumstance, a declaratory judgment remedy should not be used when an adequate remedy already exists, either in law or in equity. *Id.*

Based on relevant case law, the issue of this claim comes down to whether Woman's Clinic is seeking to construe portions of the Affiliation Agreement or whether Woman's Clinic is merely asserting a breach of contract claim. In the former situation, Missouri law looks more favorably upon granting declaratory relief. *See Washington Univ. v. Royal Crown Bottling Co. of St. Louis,* 801 S.W.2d 458, 463 (Mo.Ct.App.1990). In the latter, courts in Missouri have ruled that the plaintiffs had adequate remedies. at law or equity and found declaratory relief inappropriate. *See Michigan Sporting Goods Distribs., Inc. v. Lipton Kenrick Assoc., L.P.,* 927 S.W.2d 570, 572 (Mo.Ct.App.1996); *and Love Mortgage Properties, Inc. v. Horen,* 639 S.W.2d 839, 841 (Mo.Ct.App.1982).

The *Royal Crown* case involved a claim for declaratory relief in order to resolve the obligations of a lessor to make repairs to leased property. The court found that declaratory judgment was proper, in part, because there was no adequate remedy at law. *Royal Crown,* 801 S.W.2d at 463. The court noted that the lease involved was ongoing and did not terminate until 2001, and that other issues of repair obligations might arise in the future. *Id.* Additionally the court made mention of the fact that the plaintiffs had not requested a declaration that the lease had been breached. *Id.* Instead, the plaintiffs requested that the court interpret the repair obligation contained in the lease. *Id.* The court concluded that the case presented a situation in which "it [would] be desirable that the relationship of all the parties be established because there may be a continuing relationship or future acts which depend on the outcome [of the declaratory

judgment proceeding]." *Id.* (quoting *Polk County Bank v. Spitz,* 690 S.W.2d 192, 194 (Mo.Ct.App.1985)).

By contrast, the court in *Love Mortgage* and in *Lipton* found that plaintiffs had alternate remedies available and, thus, declaratory relief was inappropriate. *Lipton,* 927 S.W.2d at 572; *Love Mortgage,* 639 S.W.2d at 841. In *Lipton,* the court noted that the plaintiffs had requested that the court declare the lease agreement breached. *Lipton,* 927 S.W.2d at 572. The court distinguished the *Lipton* case from the *Royal Crown* decision stating that, in *Lipton,* the claim was really for breach of the lease and that an award of money damages would settle the parties' dispute. *Id.* The court had decided a nearly identical issue earlier in *Love Mortgage.* In that case, the plaintiff also requested a declaration that the defendant had breached the lease. *Love Mortgage,* 639 S.W.2d at 841. The court found that while the plaintiffs purported to seek declaratory relief, the claim was really one for breach of contract. *Id.* Thus, the court stated, declaratory relief was inappropriate. *Id.*

As to the present case, factually it is similar to all three cases. The Affiliation Agreement is ongoing and continues to govern the actions of the parties. In that sense, it is analogous to *Royal Crown* and it would seem that declaratory relief is necessary to resolve the dispute. However, the pleadings of this case are more similar to *Love Mortgage* and *Lipton.* Woman's Clinic seeks the Court to declare the Affiliation Agreement breached on account of two separate actions of St. John's. No request to construe the terms of the Affiliation Agreement has been made, though because Woman's Clinic claims breach of the ever so amorphous "good faith and fair dealing" condition, it would be necessary to construe such a condition to determine whether it was broad enough to cover St. John's conduct. Ultimately

however, the present dispute is more similar to *Love Mortgage* and *Lipton* and declaratory relief is inappropriate in this case.

The Court is most persuaded by Woman's Clinic's own pleadings. The fact it is seeking a declaration for breach of the agreement leads this Court to conclude that Count IV is a thinly veiled attempt to establish breach of contract. As such, the more proper remedy for Woman's Clinic is at law requesting money damages or in equity seeking injunctive relief. Because Woman's Clinic has alternative remedies available, declaratory relief is inappropriate. Thus, St. John's Motion for Summary Judgment on Count IV of Woman's Clinic's Complaint is GRANTED.

### CONCLUSION

For the above reasons, Defendant St. John's Motion for Summary Judgment is GRANTED in full. Plaintiff Woman's Clinic's Motion for Partial Summary Judgment is DENIED.

**IT IS SO ORDERED.**